# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RANDY E. BRETON, SR.,
    Plaintiff,

    v.

GOVERNOR NED LAMONT, et al.,
    Defendants.

No. 3:21-cv-719 (SRU)

## <u>INITIAL REVIEW ORDER</u>

Randy Breton is a sentenced state prisoner currently confined at Corrigan-Radgowski Correctional Center ("Corrigan").[1]  On May 26, 2021, Breton filed this *pro se* action pursuant to 42 U.S.C. § 1983.  *See* Compl., Doc. Nos. 1 and 1-1.[2]  Breton alleges that Governor Ned Lamont and three employees of the Connecticut Department of Correction ("DOC")—Commissioner Angel Quiros, and two officers at Garner Correctional Institution ("Garner"), Warden Amonda Hannah, and Captain Gordils (together, "the Defendants")—violated his constitutional rights between May 2020 and May 2021 by not allowing him to reside alone in a single cell.  Breton sues the Defendants in their official capacities and Captain Gordils in both his official and individual capacities.  *See* Compl., Doc. No. 1, at 1.  Primarily, Breton seeks an order directing the Defendants "to give the plaintiff sing[le] cell status till his End of Sent[e]nce date."  *Id.* at 6.

---

[1]    Pursuant to Fed. R. Evid. 201(b), I take judicial notice of the fact that Breton is a sentenced state inmate. *See* Fed. R. Evid. 201(b)(2) (explaining that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *Inmate Info.*, CONN. ST. DEP'T OF CORR., http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=173296 (last visited Aug. 23, 2021).  Breton has a maximum release date of November 18, 2031.

[2]    Part of Breton's complaint (doc. no. 1-1) was filed as an attachment to Breton's complaint.  For ease of reference, and because both documents contain Breton's allegations, I refer to both documents (doc. nos. 1 and 1-1) as Breton's complaint.

However, in other parts of his complaint, Breton also makes clear that he seeks compensatory and punitive damages from all the Defendants. *See* Compl., Doc. No. 1-1, at 26. Further, Breton requests that I freeze Captain Gordils' assets during the pendency of this action. *See id.* For the following reasons, Breton's complaint is **dismissed without prejudice**.

## I.      Standard of Review

Pursuant to 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any portion of those complaints that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.     Factual Background

This case concerns Breton's unsuccessful attempts to obtain single-cell status between May 2020 and May 2021. In general, Breton states that he wanted single-cell status because he was afraid of contracting COVID-19. *See* Compl., Doc. No. 1, at 6. Breton admits, though, that

in his grievances and informal inmate requests, he sometimes contrived other reasons for wanting single-cell status because he thought that those reasons might have a better chance of succeeding.  *See id.* ("I wrote to the warden requesting singal cell using dangers othere then Covid-19 as my reason for my request because I was afraid of catching covid but, I did not think of using covid as the reason because they didint know enough about the risk yet . . . so I tryed sexual assault risk insted.").  What follows is a chronological recounting of Breton's complaints and grievances.

On May 9, 2020, Breton wrote an inmate request form to Warden Hannah.  *See* Compl., Doc. No. 1, at 6; Inmate Request Form, Doc. No. 1-1, at 7.[3]  In that request, Breton asked to receive single-cell status because of "the risks and dangers of farced sexuall assault by othere inmates as I am forced to live in a double cell with gay inmates."  Inmate Request Form, Doc. No. 1-1, at 7.  On May 20, Captain Gordils replied that "single cell status can only [be] approved by the Court system or medical."  *Id.*

On September 10, Breton received a test for COVID-19.  Breton tested negative.  *See* Compl., Doc. No. 1, at 6; Medical Record, Doc. No. 1-1, at 8.  Breton remained fearful of contracting COVID-19, though, especially in light of his underlying conditions[4] and the DOC's failure to enforce social distancing measures or proper mask-wearing by inmates.  *See* Compl., Doc. No. 1, at 6.  On September 17, Breton wrote an inmate request form to complain about his

---

[3]      Breton has attached many relevant records and written correspondences.  Because those records and writings are attached to his complaint, I may properly consider them for purposes of this initial review.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (holding that, for purposes of a Rule 12(b) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference") (cleaned up); *Delgado v. Concepcion*, 2020 WL 7388959, at *1–2 & n.3 (D. Conn. Dec. 16, 2020) (considering, on initial review of a prisoner civil complaint, the complaint and "documents attached to and incorporated by reference" into it).

[4]      Breton claims that he has diabetes, high blood pressure, uses a CPAP machine, and is obese.  *See* Letter, Doc. No. 1-1, at 12.

fellow inmates' noncompliance.  *See* Inmate Request Form, Doc. No. 1-1, at 9.  On September 18, Captain Gordils responded that "mask compliance is being addressed daily" by Garner staff.  *Id.*  Captain Gordils continued:  "To protect yourself please make sure you comply by the department mask guidelines."  *Id.*  On October 15, Breton was again tested for COVID-19; the test was negative.  *See* Medical Record, Doc. No. 1-1, at 16.

On November 9, Breton wrote a letter to Governor Lamont to inform him of the DOC's unacceptably lax COVID-19 policies and to demand that he be either moved to a single cell or immediately released from prison.  *See* Compl., Doc. No. 1-1, at 1, 10–13 (letter).  Breton did not receive a response to his letter.  *See* Compl., Doc. No. 1-1, at 1.

Also on November 9, Breton sent an inmate request form to Warden Hannah.  *See* Inmate Request Form, Doc. No. 1-1, at 15.  In that inmate request form, Breton requested single-cell status based on his desire to "exercise religious spiritual meditation to reach the cleansing of my soul."  *Id.*  On December 18, Warden Hannah denied Breton's request because she did "not provide single cell status for offenders . . . unless it is a safety and security issue."  *Id.*

Before receiving that response from Warden Hannah, Breton had sent another inmate request to Warden Hannah on November 12.  *See* Inmate Request Form, Doc. No. 1-1, at 14.  In that inmate request form, Breton again asked to receive single-cell status.  This time, Breton listed three reasons in support of his request.  First, Breton referred back to his "last request," in which he mentioned that "religion is a factor."  *Id.*  Second, Breton referred back to his September inmate request, in which he asserted that "sexual assault dangers" justified single-cell status.  Third, Breton claimed that sharing a cell led to an unacceptably high risk of a power outage; that risk was dangerous because Breton used a CPAP machine for his sleep apnea.  *See*

*id.*  Breton summed up:  "You have 3 good reasons and I can give you a hell of a lot more reasons but you have enough for my legal claim of Covid-19."  *Id.*  On November 30, Captain Gordils responded.  *See id.*  Captain Gordils wrote:  "Attached you will find a Inmate Request where all his Questions and Concerns were Answered."  *Id.*[5]

On November 18, Breton submitted another inmate request form to Captain Gordils.  *See* Inmate Request Form, Doc. No. 1-1, at 17.  In that inmate request form, Breton explained that having "a cellmate pluging in his stuff [] blows out the power," which caused Breton's CPAP machine to stop working.  *See id.*  Breton thus claimed that he "need[ed] singal cell status for that reason only as it is life and death issue."  *Id.*  Breton also said that he suffered from underlying conditions making him more susceptible to severe infection from COVID-19, such as "high blood presher, Diabetes, and I am 300 lbs."  *Id.*  Breton speculated that he was not being provided single-cell status due to retaliation for previously suing the DOC.  *Id.*  The following day (November 19), Captain Gordils responded.  *See id.*  Captain Gordils explained that he sent a work order to maintenance regarding the electrical issue that Breton raised.  *See id.*  Captain Gordils also offered that he "underst[oo]d your concerns," but he explained that Breton could not have a single cell without a court or medical order.  *Id.*  Captain Gordils also stated that the denial of single-cell status was not retaliatory because Breton was not "privileged to a single cell."  *Id.*

On December 7, Breton sent another inmate request to Captain Gordils.  *See* Inmate Request Form, Doc. No. 1-1, at 18.  In that inmate request, Breton again asked to receive single-

---

[5]      Breton has not included that attachment.  However, I note that Captain Gordils may have been referring to the responses he made to inmate requests that Breton submitted on either May 20 or September 18, 2020.  *See* Inmate Request Forms, Doc. No. 1-1, at 7, 9.

cell status based on the issue with his CPAP machine.  *See id.*  Breton also complained that he

simply did not "get along with inmates so you are indangering me from assault."  *Id.*  On

December 10, Captain Gordils responded by directing Breton on how best to avoid electrical

issues in his cell while using his CPAP machine, to contact staff about submitting a work order if

necessary, and to strive to get along with other inmates.  *See id.*

On December 11, Breton submitted two more inmate requests to Captain Gordils.  *See*

Inmate Request Forms, Doc. No. 1-1, at 19–20.  In the first inmate request, Breton raised yet

another issue that, in his view, necessitated his being granted single-cell status:  Breton

complained that having double-celled inmates eat in their cells caused sanitation issues because

only one inmate could eat at the cell's desk, while the other inmate had to eat his food sitting on

his bed.  *See* Inmate Request Form, Doc. No. 1-1, at 19.  That issue was compounded by the fact

that DOC "only dose laundry once a week."  *Id.*  Thus, "if an inmate wants to eat a hot meal he is

forced to eat on his bed or eat his food cold!"  *Id.*  On December 15, Captain Gordils responded

and explained that DOC sought to have inmates eat in their cells to prevent the spread of

COVID-19.  *See id.*  Captain Gordils suggested that the cellmates take turns eating at the desk

while their food was still hot.  *See id.*

In the second inmate request that Breton submitted on December 11, Breton asked to

receive single-cell status because Captain Gordils had given bad advice regarding how to avoid

electrical issues with his CPAP machine.  *See* Inmate Request Form, Doc. No. 1-1, at 20.  On

December 15, Captain Gordils responded and explained that "single cells are granted by medical

or by the court system" and that other inmates used their CPAP machines without difficulty.  *Id.*

Those two December 11 inmate requests were the last inmate requests that Breton submitted

6

regarding his requests to obtain single-cell status.[6]  In Breton's view, the information provided in

his many inmate requests "gave Capt. Gordils more then enough safety and security reasons to

grant my singal cell request."  Compl., Doc. No. 1-1, at 2.

Between January 6 and February 25, 2021, Breton was tested five times for COVID-19;

each test was negative.  *See* Medical Records, Doc. No. 1-1, at 21–25.  However, Breton claims

that, on March 22, he tested positive for COVID-19.  *See* Compl., Doc. No. 1-1, at 2, 4.  Breton

claims that he contracted COVID-19 "because I was forced to double cell with a young inmate

that did not socially distance himself or where a maks half the time he went out for recreation."

*Id.* at 2.  Breton's cellmate had tested negative, although he informed Breton that he previously

had COVID-19.  *Id.*  Breton claims that for two weeks he suffered from COVID-19 symptoms,

including difficulty breathing, coughing up blood, body pain, and headaches.  *See id.* at 3.

Breton now uses an inhaler, moves more slowly than before, and has constant headaches.  *See id.*

The following passage in Breton's complaint well summarizes the gravamen of his complaint:

> [T]he fact that I got [COVID-19] in D.O.C. custody makes the state liabile for not
> taking such procoutions as I requested in my many request and the letter to Lamont
> himself where I was ignored having my conserns sweped under the rug so to speak;
> or got nothing but lip service from Capt. Gordils.

Compl., Doc. No. 1-1, at 3.

## III.   Discussion

Breton alleges that the Defendants took inadequate steps to safeguard him from

contracting COVID-19.  I construe Breton's complaint as suing all the Defendants in both their

---

[6]     Breton asserts that he stopped sending inmate requests for two reasons.  First, Breton explained that "I have injurys to my body from covid that the grievance procedur can not remediey, and issue is non-grievable when the grievance system has no remedy for it."  Compl., Doc. No. 1-1, at 4–5.  Second, Breton claimed that "Capt. Gordils always intercepted my request to the warden on safety and security issues effectly stoping my use of chaine of command that I must used to be allowed to file a Grievance."  *Id.* at 4.

individual and official capacities for monetary damages and an injunctive order to provide him

with single-cell status.[7]  Construed liberally, Breton's complaint asserts that the Defendants

violated the First, Eighth, and Fourteenth Amendments.  Breton's complaint fails to state any

plausible claim for relief.

      A.    <u>Eighth Amendment</u>

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the

hands of prison officials.  *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991); *Estelle v. Gamble*,

429 U.S. 97, 104 (1976).  Although the Constitution does not require "comfortable" prison

conditions, the Eighth Amendment imposes certain duties on prison officials to "ensure that

inmates receive adequate food, clothing, shelter, and medical care" and to "take reasonable

measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832–33

(1994) (cleaned up).  To state an Eighth Amendment claim based on unlawful conditions of

confinement, an inmate must demonstrate both an objective and a subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under

conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[]

necessit[y]" or a "substantial risk of serious harm."  *Id.* at 834 (cleaned up).  To meet the

subjective element, an inmate must allege that the defendant prison officials possessed culpable

intent; that is, the officials must have known that the plaintiff faced a substantial risk to his health

---

[7]      Although Breton at one point mentions that he sues Governor Lamont, Commissioner Quiros, and Warden Hannah in "there official capacity only," *see* Compl., Doc. No. 1, at 1, he also later asks that I "order compensatory damages from all defendants named herein," Compl., Doc. No. 1-1, at 26.  Of course, though, "[t]he Eleventh Amendment bars an action for damages against a state in federal court, and this bar extends to suits brought against state officials in their official capacity."  *Reid v. Schuman*, 83 F. App'x 376, 377 (2d Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)).  Thus, construing Breton's complaint to allege both individual and official capacity claims against all the Defendants gives effect to Breton's intent:  To seek both monetary damages and equitable relief.  Construing Breton's complaint in that way causes no prejudice to the Defendants because, as explained below, I dismiss Breton's complaint in its entirety.

or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837.  Thus, an allegation of "mere negligence" is insufficient.  *Id.* at 835.  Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

     1.    Individual Capacity Claims

Breton's individual capacity claims fail for several reasons.  First, Breton's complaint does not adequately allege the personal involvement of either Governor Lamont or Commissioner Quiros.  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (cleaned up).  That is true for supervisory officials, too. *See Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) (explaining that to "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability").  Breton does not mention Commissioner Quiros anywhere in the body of his complaint:  Breton never spoke or wrote to Commissioner Quiros.  Breton's only allegation relating to Governor Lamont regards the November 2020 letter that Breton wrote Governor Lamont, to which Governor Lamont did not respond. *See* Compl., Doc. No. 1-1, at 1, 10–13 (letter).  That bare allegation is insufficient to establish that Governor Lamont was personally involved in any alleged constitutional violation in this case. *See Kerr v. Cook*, 2021 WL 765023, at *3 n.2 (D. Conn. Feb. 26, 2021) (explaining that plaintiff had not plausibly alleged Senator Chris Murphy's personal involvement because plaintiff "alleges only that he sent

9

letters to Senator Murphy").

Second, in my view, Breton's claims likely do not satisfy the Eighth Amendment's objective test.  At bottom, Breton complains that he was forced to live with a cellmate during the COVID-19 pandemic.  To be sure, "conditions posing an elevated chance of exposure to an infectious disease can pose a substantial risk of serious harm." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y. 2020); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease.").  However, "whether a particular danger poses a substantial risk of serious harm in a prison must be evaluated in light of the steps that the facility has already taken to mitigate the danger." *Chunn*, 465 F. Supp. 3d at 200 (citing *Helling v. McKinney*, 509 U.S. 25, 35–36 (1993)).  The DOC has taken numerous measures to mitigate the risk of COVID-19 in its facilities.  *See generally* Health Info. and Advisories, CONN. ST. DEP'T OF CORR., https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Health-Information-and-Advisories (last visited Aug. 23, 2021).

Furthermore, under Connecticut law, prison officials generally enjoy substantial "discretion to determine where an inmate will be incarcerated." *Abrams v. Waters*, 2018 WL 1469057, at *5 (D. Conn. Mar. 26, 2018) (citing Conn. Gen. Stat. § 18-86).  Double-celling inmates does not generally rise to the level of a constitutional violation.  *See Rhodes v. Chapman*, 452 U.S. 337, 347–48 (1981) (double-celling inmates in overcrowded facility not unconstitutional).  For double-celling to be unconstitutional, an inmate must "substantiate a medical or mental health diagnosis that would require confinement in a single cell." *Abrams*, 2018 WL 1469057, at *6 (cleaned up); *see also Jarecke v. Hensley*, 2009 WL 2030394, at *8 (D.

Conn. 2009) (granting summary judgment to defendant prison officials on inmate's claim based on substantive due process right to single cell where plaintiff had not presented "any evidence that such an accommodation is medically required"). Here, Breton alleges that he was scared of contracting COVID-19 and that he had certain underlying conditions that made him particularly susceptible to severe illness from COVID-19. It is unlikely that those allegations—which would fairly describe a substantial number of state prisoners—are sufficiently serious to rise to the level of a constitutional violation on the facts of this case.

However, I need not determine whether Breton's claim meets the Eighth Amendment's objective test because, even if it did, Breton's claim fails because it does not pass the subjective test. Breton has not sufficiently alleged that either Warden Hannah or Captain Gordils acted with deliberate indifference to his complaints. With respect to Warden Hannah, Breton alleges only that she responded to his November 9 inmate request form. In that inmate request form, Breton requested single-cell status based on his desire to "exercise religious spiritual meditation to reach the cleansing of my soul." Inmate Request Form, Doc. No. 1-1, at 15. About one month later, Warden Hannah denied Breton's request because she did "not provide single cell status for offenders . . . unless it is a safety and security issue." *Id.* Nothing about that denial or its surrounding circumstances can plausibly support an inference that Warden Hannah recklessly disregarded a substantial risk of serious harm to Breton's health or safety.

Captain Gordils responded to all the rest of Breton's inmate requests. In those responses, Captain Gordils repeatedly explained that he was unable to provide Breton single-cell status without a court or medical order and that other inmates' mask non-compliance was being addressed daily. *See* Inmate Request Forms, Doc. No. 1-1, at 9, 14, 17–20. Indeed, Captain

11

Gordils was not indifferent to Breton's complaints:  He told Breton that he "underst[oo]d your concerns."  Inmate Request Form, Doc. No. 1-1, at 17.  And Captain Gordils repeatedly offered suggestions regarding how to address the issues that Breton raised.  *See, e.g.*, Inmate Request Forms, Doc. No. 1-1, at 9 ("To protect yourself please make sure you comply by the department mask guidelines."); *id.* at 18 (directing Breton how best to avoid electrical issues in his cell while using his CPAP machine, to contact staff about submitting a work order if necessary, and to strive to get along with other inmates); *id.* at 19 (explaining that DOC sought to have inmates eat in their cells to prevent the spread of COVID-19 and suggesting that "[i]f you and your cellmate take turns utilizing the desk (15 minutes) you both will have the opportunity to consume a warm meal").  Furthermore, Breton has not alleged any facts suggesting that Captain Gordils had—and failed to exercise—the authority to provide Breton with single-cell status.  Thus, Breton does not plausibly allege that Captain Gordils acted recklessly by failing to provide Breton with such status.  *See Warwick v. Doe*, 2020 WL 2768804, at *5 (D. Conn. May 27, 2020) (explaining that, absent facts suggesting that defendant actually had—and failed to exercise—authority to arrange for plaintiff to see dental surgeon sooner, plaintiff's allegations could support, at most, inference of negligence); *see also Davis v. Conn. Corr. Managed Health Care*, 2017 WL 20910, at *2 (D. Conn. Jan. 2, 2017).

I dismiss Breton's Eighth Amendment claims against the Defendants in their individual capacities because they fail to state a claim upon which relief may be granted.  *See* 28 U.S.C. 1915A(b).

### 2.      Official Capacity Claims

When a party sues a state official in his or her official capacity, "a federal court's

remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief . . . and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 677 (1974); *Ex parte Young*, 209 U.S. 123, 155–56 (1908).  That is, a plaintiff may sue a state official acting in an official capacity for prospective injunctive relief from continuing violations of federal law.  *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371–72 (2d Cir. 2005).  The *Ex parte Young* exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

Unlike an individual capacity claim for monetary damages under section 1983, personal involvement in the alleged constitutional violation is not a prerequisite to official capacity claims for injunctive relief.  *See Hamilton v. Deputy Warden*, 2016 WL 6068196, at *13 (S.D.N.Y. Oct. 13, 2016).  However, a claim for injunctive relief against a defendant in his or her official capacity may proceed only to the extent that the defendant has the authority to remedy the alleged ongoing constitutional violation.  *See Scozzari v. Santiago*, 2019 WL 1921858, at *6 (D. Conn. Apr. 29, 2019).  Further, any prospective relief regarding prison conditions must be "narrowly drawn, extend[] no further than necessary to correct the violation of a federal right, and [be] the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a)).  In a prisoner case, a court should not enter "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id.* at 531; *Abernathy v. Comm'r of Corr.*, 2020 WL 5097566, at *3 (D. Conn. Aug. 28, 2020) ("[I]n the prison context, a request for injunctive relief must always be

viewed with great caution so as not to immerse the federal judiciary in the management of state prisons.") (cleaned up).

Breton's Eighth Amendment claim for prospective injunctive relief—that he receive "singal cell status till his End of Sentance," Compl., Doc. No. 1, at 6—fails for several reasons. First, it appears that Breton's claim is barred by a release provision in a settlement agreement that binds Breton.  In *McPherson, et al. v. Lamont, et al.*, No. 3:20-cv-534 (JBA), a number of state prisoners and detainees (represented by the ACLU) filed a class-action complaint against Governor Lamont and Commissioner Rollin Cook, in their official capacities.  *See McPherson* Compl., Doc. No. 1.  In July 2020, a class was certified; the class includes "all persons who were incarcerated in a DOC facility from March 1, 2020, or are incarcerated, or in the future will be so incarcerated, until the termination date of this Agreement, December 31, 2020."  *McPherson* Settlement Agreement, Doc. No. 160-1, at ¶ 35.  As other courts have noted, Connecticut state inmates who meet that definition—like Breton—are members of the class and are bound by the relevant settlement agreement.  *See, e.g.*, *Kerr*, 2021 WL 765023, at *5.

The *McPherson* settlement agreement contains a general release provision that reads, in relevant part:

> [A]ll class members . . . , in consideration of the benefits of this Agreement, release and forever discharge the defendants . . . , the State of Connecticut, all agencies of the State of Connecticut, all present and former officers, employees and agents of the State of Connecticut, (including all current and former employees of the  . . . Department of Correction . . . ), in both their official and individual capacities . . . from all actions, causes of action, suits, claims, or controversies for any and all forms of non-monetary relief arising from acts or omissions alleged in the Complaint, or from acts or omissions that could have been litigated by the class in this action.

*McPherson* Settlement Agreement, Doc. No. 160-1, at ¶ 30.  As other courts have noted, a

Connecticut state inmate's request to be transferred to a single cell is "a claim for non-monetary relief relating to the COVID-19 response that was and/or could have been raised" in *McPherson*. *Kerr*, 2021 765023, at \*5 (cleaned up). Thus, in my view, Breton's claim for injunctive relief against the Defendants is barred and could be dismissed on that basis alone.

Even if Breton's claim for injunctive relief were not barred, it would be moot against Warden Hannah and Captain Gordils. According to Breton, both of those defendants work at Garner. *See* Compl., Doc. No. 1, at 3. Now, though, Breton resides at Corrigan. *See Inmate Info.*, CONN. ST. DEP'T OF CORR., http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=173296 (last visited Aug. 23, 2021). "In the Second Circuit, an inmate's transfer from a correctional facility generally moots claims for declaratory and injunctive relief against officials at that facility." *Gray v. Licon-Vitale*, 2021 WL 124320, at \*1 (D. Conn. Jan. 13, 2021) (citing *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011)). Thus, Breton's claims for injunctive relief against Warden Hannah and Captain Gordils are moot.

Finally, even assuming that Breton had alleged a plausible and ongoing Eighth Amendment violation based on the DOC's failure to enforce COVID-19 protection measures, Breton would not be entitled to the injunctive relief that he seeks. That is because Breton's request for single-cell status until the end of his sentence would not be narrowly tailored to remedying the violation he alleges. Breton still has approximately 10 years of his sentence to serve. The risk of COVID-19 exposure has already abated considerably, and hopefully the risk will continue to decline during the remainder of Breton's incarceration. Further, being assigned single-cell status would not actually remedy the risk of COVID-19 exposure that Breton

highlights. An effectual remedy would necessitate Breton's being alone outside of his cell, too—such as during recreation, meals, and while traveling throughout the prison. But Breton does not seek that relief. For those reasons, I dismiss Breton's Eighth Amendment claim against the Defendants in their official capacities because it fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b).

      B.    <u>First Amendment Retaliation</u>

In passing, Breton suggests that Captain Gordils denied him single-cell status as retaliation for Breton's filing complaints against the DOC. *See* Inmate Request Form, Doc. No. 1-1, at 17. I construe Breton's allegation as stating a claim for retaliation in violation of the First Amendment. So construed, Breton's claim is implausible, and I dismiss it.

A claim of First Amendment retaliation has three elements: The plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See, e.g.*, *Booth v. Comm'r of Corr.*, 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019). An "adverse action" is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (cleaned up). And, to properly allege a causal connection between the two, an inmate must plead facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against him." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton*

*v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)) (cleaned up).

Courts in the Second Circuit "approach prisoner retaliation claims 'with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (cleaned up).

Breton's retaliation claim is entirely conclusory. Even if Breton engaged in protected activity—he writes that he was retaliated against "for suing D.O.C.," Inmate Request Form, Doc. No. 1-1, at 17—he has not plausibly alleged (1) an adverse action or (2) a causal connection between his protected activity and any adverse action. Regarding (1), Breton has not alleged that he had a constitutional right to a single cell, and therefore the denial of his request would not deter an ordinary inmate from exercising a constitutional right. Regarding (2), Breton alleges no specifics regarding his "suing D.O.C." or what, if anything, any of the Defendants may have known about that. *See Schlosser v. Manuel*, 2020 WL 127700, at *4 (D. Conn. Jan. 10, 2020) (dismissing retaliation claims where plaintiff had not alleged that defendant was aware that plaintiff had filed a grievance). Accordingly, Breton has not alleged a plausible First Amendment retaliation claim.[8]

---

[8]        One of Breton's inmate request forms appears to reference his religious beliefs. *See* Inmate Request Form, Doc. No. 1-1, at 15 ("I cannot exercise religious spiritual meditation to reach the cleansing of my soul point in spiritual meditation to gain the inlightenment I need for ascension as the ancints did; when I have an evil minded cell mate it prevents my separation from evil and imposed burden the effect of the practice."). I do not view that

C.      Interference with Grievance Procedure

Breton expresses consternation that Captain Gordils responded to many of his inmate

requests, even though the complaints were often addressed to Warden Hannah.  *See, e.g.*,

Compl., Doc. No. 1-1, at 1.  Construed liberally, then, I assume that Breton raises a constitutional

claim based on Captain Gordils' alleged interference with his grievances.  So construed, I

dismiss Breton's claim.  To be sure, inmates have a constitutional right of access to the courts.

*See Christopher v. Harbury*, 536 U.S. 403, 415 & n.12 (2002) (noting that the right is clear, even

if its source—Article IV's Privileges and Immunities Clause, the First Amendment's Petition

Clause, the Due Process Clauses of the Fifth and Fourteenth Amendments, or the Fourteenth

Amendment's Equal Protection Clause—is unclear).  However, "inmate grievance programs

created by state law are not required by the Constitution, and consequently allegations that prison

officials violated those procedures do not give rise to a cognizable Section 1983

claim."  *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (cleaned up).

Put differently, "[i]nmates have no constitutional entitlement to grievance procedures, to receive

a response to a grievance, or to have a grievance processed properly."  *Schlosser*, 2020 WL

---

reference to raise a free exercise claim.  However, even were I to construe Breton's complaint as raising a free
exercise claim, I would dismiss it.  To state a First Amendment free exercise claim, an inmate must allege "that the
disputed conduct substantially burden[ed] his sincerely held religious beliefs."  *Salahuddin v. Goord*, 467 F.3d 263,
274–75 (2d Cir. 2006); *see also Richard v. Strom*, 2018 WL 6050898, at *4 n.1 (D. Conn. Nov. 19, 2018)
(acknowledging uncertainty whether "substantial burden" is the correct threshold test, but observing that "absent
instruction to the contrary, Second Circuit courts have continued to assume the validity of the substantial burden test
when addressing free exercise claims").

In this case, Breton's fleeting mention of religion does not raise an inference that he has sincerely-held
religious beliefs, nor that the Defendants' conduct substantially burdened those beliefs.  Breton's mention of religion
appears unimportant.  Indeed, Breton does not mention his religious beliefs in his complaint:  He references it only
in a November 9, 2020 inmate request form that he attached to his complaint.  *See* Inmate Request Form, Doc. No.
1-1, at 15.  Relatedly, Breton appears to acknowledge that several of his asserted bases for relief were merely covers
for his real complaint:  He was afraid of contracting COVID-19.  *See* Compl., Doc. No. 1, at 6 ("I wrote to the
warden requesting singal cell using dangers othere then Covid-19 as my reason for my request because I was afraid
of catching covid but . . . I did not think D.O.C. staff would take any action on singal cell status for that reason so I
tried sexual assault risk instead.").

127700, at *5 (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018)).  If prison officials prevented Breton "from taking advantage of a grievance process through machination, misrepresentation, or intimidation[,]" Breton might be excused from the Prison Litigation Reform Act's administrative exhaustion requirement.  *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016).  But that is a different issue:  An exception to the Prison Litigation Reform Act's exhaustion requirement does not create a constitutionally-protected interest.  Accordingly, I dismiss Breton's claim based on Captain Gordils' alleged interference with his grievances.  *See* 28 U.S.C. § 1915A(b).

       D.    <u>Request to Freeze Assets</u>

I need not consider Breton's request to freeze Gordils' assets because Breton has not alleged any plausible claims in this action.  However, I note that Breton's request is essentially a request for a prejudgment remedy, which is governed by Connecticut law.  *See* Fed. R. Civ. P. 64(a); *Bahrain Telecomms. Co. v. Discoverytel, Inc.*, 476 F. Supp. 2d 176, 183 (D. Conn. 2007); *Everspeed Enters. Ltd. v. Skaarup Shipping Int'l*, 754 F. Supp. 2d 395, 401 (D. Conn. 2010) ("Rule 64 of the Federal Rules of Civil Procedure permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action.").

"Under Connecticut law, a prejudgment remedy is appropriate if the court, 'upon consideration of the facts before it and taking into account any defenses, . . . finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought.'"  *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (quoting Conn. Gen. Stat. § 52-

278d(a)) (cleaned up).  That is, "[a] prejudgment remedy may be obtained when the plaintiff establishes that there is probable cause to sustain the validity of his claims."  *Davila v. Secure Pharmacy Plus*, 329 F. Supp. 2d 311, 313 (D. Conn. 2004).

Pursuant to Connecticut law, "no prejudgment remedy shall be available to a person . . . unless he has complied with the provisions of sections 52-278a to 52-278g[.]"  Conn. Gen. Stat. § 52-278b.  Section 52-278c sets forth the documents that a party must file in connection with an application for a prejudgment remedy and the notice that such a party must serve upon a defendant.  *See id.* § 52-278c.  For instance, as relevant here, a party's application for a prejudgment remedy must be accompanied by an "affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought . . . will be rendered in the matter in favor of the plaintiff."  *Id.* § 52-278c(a)(2).  The party's application must also include order and summons forms.  *Id.* § 52-278c(a)(3)–(4), (b).  Further, section 52-278c "requires that a notice and claim form containing specific language be attached to the application for prejudgment remedy."  *Davila*, 329 F. Supp. 2d at 314 (citing Conn. Gen. Stat. § 52-278c(e), (f), and (g)).

Even if Breton had stated a plausible claim in this action, his request for a prejudgment remedy to freeze the assets of Captain Gordils is deficient because it fails to identify the amount of the prejudgment remedy that he seeks to secure and is not accompanied by the statutorily-required affidavit or other documents and forms.  *See, e.g.*, *Adeyemi v. Murphy*, 2012 WL 6155213, at *2 (D. Conn. Dec. 11, 2012) (denying a motion for prejudgment remedy for failure to comply with the statutory requirements of Conn. Gen. Stat. § 52-278c); *Porter v.*

*Yale Univ. Police Dep't*, 2011 WL 3290212, at *4 (D. Conn. Aug. 1, 2011) (same).

**IV.**     **Conclusion**

For the foregoing reasons, Breton's complaint is **dismissed without prejudice**.  I will

afford Breton one opportunity to file an amended complaint.  Breton must file that amended

complaint by **September 22, 2021**.  The amended complaint must correct the deficiencies that I

have identified in this initial review order.  Failure to file an amended complaint by **September**

**22, 2021** will result in a dismissal of the complaint with prejudice.  Breton is advised that any

amended complaint will completely replace his prior complaint in this action, and that no portion

of any prior complaint shall be incorporated into his amended complaint by reference.


It is so ordered.

Dated at Bridgeport, Connecticut this 23d day of August 2021.


<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge